CHRO Capitol
Date Filed 8/29/01
CHRO No. 0210109
EEOC No. 16AA11443

STATE OF CONNECTICUT
COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

AFFIDAVIT OF ILLEGAL DISCRIMINATORY PRACTICE

DATE: August 29, 2001    CASE NO.: 0210109

My name is Norma Christian and I reside at 517 Grassy Hill Road, Orange, Connecticut 06477.

The respondent is the Connecticut Judicial Branch, Court Operations Division, whose business address is 75 Elm Street, Hartford, Connecticut 06106.

I was

(X) suspended
(X) warned
(X) harassed

on a continuous basis beginning with my return to work from a seriously disabling accident on February 23, 2001, to the most recent incident, my suspension without pay of which I was notified in writing on May 30, 2001, and which took place between June 4, 2001, and July 13, 2001, and believe that my:

(X) race
(X) color
(X) physical disability

was in part a factor in this action. I believe that the respondent violated the following Connecticut General Statutes Sections enforced through Section 46a-58(a) and acts listed below:

(X) 46a-60(a)(1)
(X) Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991
(X) Sec. 504 of Rehabilitation Act of 1973, as amended

RECEIVED
AUG 29 2001
COMMISSION ON HUMAN RIGHTS
AND OPPORTUNITIES
CAPITOL REGION

EXHIBIT NO. 1
Christian v. Judicial
3:03CV0524(RNC)

## THE PARTICULARS OF MY COMPLAINT ARE AS FOLLOWS:

1. I am a black, African-American woman.

2. The Court Operations Division is a division of the Judicial Branch of the State of Connecticut.

3. I have been employed by the respondent as a Court Reporter for approximately twenty-four (24) years.

4. On February 27, 2000, I was involved in an automobile accident in which I sustained a badly fractured hip. The complexity of my injury was so severe that I was unable to work for a year.

5. On January 30, 2001, my physician issued a written notice to the respondent advising of my condition and that I would be able to return to work on February 23, 2001, with "a lifting restriction and she will need to be able to get up and move around during short intervals."

6. Sabrina Santoro is the Court Reporter for the Judicial District of New Haven, where I have been employed throughout my career. She is my supervisor. She was not present when I returned to work on February 23, 2001, and when she was called at home and told I had arrived she falsely stated that "Hartford" knew nothing about my plans to return to work that day. On February 26, 2001, she rejected my physician's note, claiming that she was acting on behalf of the respondent. She required me to produce a note advising whether I would have the ability to lift my steno machine and defining "what exactly short intervals are." She refused to permit me to return to work until such a further note was produced.

7. Such a note was produced and I returned to work at the end of February, 2001.

8. Upon my return to work, I discovered that my belongings had been remmoved from my desk and file cabinet and thrown in boxes and placed on the floor in my office. A couple of those boxes had been overturned and my possessions had been scattered over the floor. In addition, my own personal computer desk had been altered by the removal of the keyboard tray. In addition, the tripod for my steno machine had been broken.

9. In my 24 years as a court reporter, I have seen many white caucasian court reporters go out on extended leaves and their property never has been treated this way in their absence.

10. In addition, upon my return to work, Ms. Santoro refused to provide me with

a key card so I could utilize the automated equipment to exit the courthouse parking garage. Another white caucasian court reporter informed me that: "Sabrina told me not to give it to you because she has something else for you."

11. I complained in writing about these discriminatory and abusive events.

12. In the past, when white caucasian court reporters were out on extended leaves of absence and returned, Ms. Santoro's practice always was to assign them to light duty work when they returned. For example, one such reporter had been out for five months and when she returned she was assigned for five months to hearings with a Judge Trial Referee who was known for working short days and for the informal and relaxed nature of proceedings conducted before him.

13. When I returned from my leave in February of 2001, I was immediately assigned to the courtroom of Judge Alander, where contested family matters were heard. This was probably the busiest and most chaotic courtroom in the building at 235 Church Street and Ms. Santoro was well aware of that fact when she gave me the assignment.

14. Concomitantly with giving me the most strenuous assignment in the courthouse, Ms. Santoro began badgering me about completing my work promptly. If I went across the street during a break to purchase a cup of coffee, she berated me for doing so. She continually monitored my comings and goings within the courthouse. When I gave an estimate to an attorney of the time required to produce a requested transcript, she cut the time back.

15. Because of the intense pressure Ms. Santoro was placing upon me, I began using a court monitoring recorder to back up my own stenographic notes of courtroom proceedings before Judge Alander so I would be certain that my work in that chaotic courtroom was accurate. On occasion, other white caucasian court reporters had done this. When Ms. Santoro learned of my actions, she informed me that I would be reclassified as a court monitor and my pay would be reduced. After I objected to this unfair and discriminatory treatment, her order was countermanded.

16. On March 16, 2001, Ms. Santoro again subjected me to verbal harassment, in front of others, concerning my working habits. Later that day, all of my stenographic notes generated since my return to work in February were removed from my locked office. At approximately 3:20 that afternoon, I again encountered Ms. Santoro in a hallway in the courthouse. She accosted me and loudly demanded: "Don't you have work to do?" When I asked her why she was so angry with me, she replied: "You don't know?" I replied that I did not, and she said: "You're going to pay!" She then told me that I should be preparing transcripts and I pointed out that she had confiscated my steno notes. She told me that all my notes would thereafter be kept in her office and then she said loudly: "Get your ass to your office and do your transcripts!" I approached her office door to continue the discussion and she shouted:

4

"Get away from my office you black bitch!" She thereupon slammed the door in my face.

17. On March 18, 2001, I reported these events in writing to Nancy Brown, the Manager of Transcript Services for the State of Connecticut. In response, and in retaliation, James R. Maher, the Director of Court Operations for the State of Connecticut, on March 21, 2001, suspended me with pay. Thereafter, on April 2, 2001, I was reassigned to the Juvenile Court in New Haven. I have had that assignment ever since.

18. On April 9, 2001, Ms. Santoro ordered me in writing to turn in my stenographic notes at the end of each business day. This requirement has never been imposed upon white caucasian court reporters to my knowledge.

19. On April 23, 2001, Ms. Santoro ordered me to report to "a formal counseling session on April 24th at 8:30 a.m. in my office...." She denied me union representation at that meeting. Nancy Brown was present to back up Ms. Santoro, however.

20. Later on April 24, 2001, Ms. Brown sent me a written memorandum backing up Ms. Santoro's previous order to turn in my steno notes to Ms. Santoro. In her memo, she falsely implied that I was not punctual in performing my duties. She further, gratuitously, threatened me with "discipline" should I fail to conform to these requirements. To my knowledge, no white caucasian court reporter has been subjected to such treatment.

21. On May 30, 2001, Joseph D'Alesio, the Executive Director of Court Operations, acting jointly with Mr. Maher, Ms. Brown and Ms. Santoro, suspended me without pay from June 4, 2001, through July 13, 2001, on the ground that I had lost stenographic notes. In fact, those notes had been confiscated from me by Ms. Santoro and Mr. D'Alesio, Mr. Maher, Ms. Brown and Ms. Santoro all were well aware of that fact.

22. In the manner noted above, I have been and am continuing to be subjected to discrimination and disparate treatment because of my handicap and because of my race and color. Moreover, I am being retaliated against because I have complained about this discrimination. I have been employed in my position for two dozen years and have an excellent record. I do not deserve this type of treatment.

## NOTARIZATION

I request the Connecticut Commission on Human Rights and Opportunities investigate my complaint, secure for me my rights as guaranteed to me under the above cited laws and secure for me any remedy to which I may be entitled.

Norma Christian, being duly sworn, on oath, states that she is the Complainant herein; that she has read the foregoing complaint and knows the content thereof; that the same is true of her own knowledge, except as to the matter herein stated on information and belief and that as to these matters she believes the same to be true.

Dated at New Haven, Connecticut, this __28th__ day of August, 2001.

*Norma Christian*
NORMA CHRISTIAN

Subscribed and sworn to before me this __28th__ day of August, 2001.

*MaryAnn Potonic*
Notary Public
~~Commissioner of the Superior Court~~

RECEIVED
AUG 29 2001
COMMISSION ON HUMAN RIGHTS
AND OPPORTUNITIES
CAPITOL REGION